## AFFIVDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Ryan Roskey, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a warrant to search a blue Buick Rendezvous (SUBJECT PROPERTY), further described in Attachment A, for evidence, instrumentalities, and fruits of criminal violations of 18 U.S.C. § 924(c), firearm possession in furtherance of violent crime, and in violation of 18 U.S. Code § 1951, interference with commerce by threats or violence (Hobbs Act Armed Robbery), and 18 U.S.C. § 2, aiding and abetting, and 18 U.S.C. § 371 conspiracy to commit the same offenses (SUBJECT OFFENSES), further described in Attachment B. There is probable cause to believe that TODD LAMONTE HARRIS JR., and others known and unknown, have committed the SUBJECT OFFENSES, and that fruits of crime and evidence of the SUBJECT OFFENSES will be found in the SUBJECT PROPERTY.

2.      I am a Special Agent of the Federal Bureau of Investigation ("FBI") and have served as such since 2019, and during that time I have investigated numerous violations of federal law. I am presently assigned to the Lansing Resident Agency of FBI Detroit Division. Prior to becoming an FBI Special Agent, I was employed as a police officer and detective for approximately 10 years. As a police detective, I was responsible for numerous types of complex criminal investigations involving child abuse, sexual assault, internet crimes against children, child sexual abuse material, drug endangered children, human trafficking, narcotics trafficking, firearms violations, gang investigations, fugitives, and violent crime. In this role, I have been assigned to the United States Marshals Violent Fugitive Task Force and the FBI Omaha Safe Streets Task Force.  I have completed hundreds of hours of specialized investigative training from the FBI, Drug Enforcement Agency (DEA) and United States Department of Justice. My current duties

1

with the FBI include the investigation of various violations of federal criminal law, including but not limited to matters involving 18 U.S.C. § 924(c), firearm possession in furtherance of violent crime, and in violation of 18 U.S. Code § 1951, interference with commerce by threats or violence (Hobbs Act Armed Robbery), and 18 U.S.C. § 2, aiding and abetting, and 18 U.S.C. § 371 conspiracy to commit the same offenses (SUBJECT OFFENSES).

3.      During the performance of my duties as a Special Agent with the FBI, I have participated with other law enforcement officers and agents in the investigation of allegations that TODD LAMONTE HARRIS JR., date of birth (DOB) XX/XX/2001, has engaged in violations of the SUBJECT OFFENSES.  The information contained in this continuation is based upon information provided to me by other law enforcement officers and agents who have participated in this investigation.  This continuation does not contain all the information known as a result of this investigation, but only those facts that I believe are necessary to establish probable cause for the search warrant sought.

**SUSPECT INFORMATION**

4.      TODD LAMONTE HARRIS JR. is a 20-year-old man who resides in Grand Rapids, Michigan.

5.      PASCHAL UCHENDU is a 25-year-old man who resides in Mason, Michigan.  Uchendu worked for Empyreal Logistics since November 2021.  In this role, UCHENDU drove a cash-in-transit van also known as a money currier vehicle. UCHENDU's employment at Empyreal Logistics was terminated after February 15, 2022.

2

## SUMMARY OF INVESTIGATION

6.     On February 15, 2022, PASCHAL UCHENDU (UCHENDU) reported to law enforcement that while driving an Empyreal Logistics cash-in-transit van he had been intercepted and robbed by two individuals.  UCHENDU reported that one of the robbers possessed a rifle during the robbery.

7.     Law enforcement interviewed UCHENDU immediately following his report of the armed robbery. Law enforcement reviewed video surveillance footage and audio recordings from the cash-in-transit van's security system as well as other security systems along UCHENDU's February 15, 2022, path of travel.  Law enforcement also interviewed Empyreal Logistics personnel regarding its policies and procedures as well as UCHENDU's training.

8.     I am informed that (1) law enforcement found that UCHENDU violated Empyreal Logistics policies and procedures regarding stopping the cash-in-transit van during his route; (2) UCHENDU made a personal stop at Best Buy during his route and two suspect vehicles involved in the robbery arrived at the same Best Buy parking lot at or near the exact time UCHENDU arrived; (3) law enforcement determined multiple inconsistencies between UCHENDU's statements to law enforcement regarding the details of the robbery and the video and audio footage  obtained by law enforcement; (4) UCHENDU admitted he communicated with others using the DEVICE around the time of the robbery but could not recall the names of each of those individuals; and (5) UCHENDU agreed to participate in a polygraph examination conducted by the FBI on February 18, 2022, in which he was asked about his role, if any, in the February 15, 2022, robbery and the results of the polygraph examination were deemed conclusive and deception was indicated.

3

9.      On February 21, 2022, at 9:07 AM, Kent County deputies recovered a blue Buick Rendezvous which had been sprayed with green spray paint in some places and appeared to have been cleaned with bleach or some other chemical cleaner (SUBJECT PROPERTY).  Deputies recovered the vehicle identification number (VIN) and interviewed the registered owner TODD LEMONTE HARRIS JR. (HARRIS).

10.      On February 21, 2022, HARRIS was interviewed and told deputies that he sold the vehicle on December 15, 2021.  However, the investigation has revealed that Valvoline, located at 4403 Eastern Southeast, Kentwood, Michigan, serviced the blue Buick Rendezvous registered to HARRIS on February 5, 2022, and February 15, 2022 (the day of the robbery).  Surveillance footage from Valvoline depicts a driver who bears similarities to HARRIS driving the blue Buick Rendezvous on February 5, 2022.

11.      On February 23, 2022, I attempted to make contact with HARRIS.  I spoke with HARRIS via telephone and learned that he had left the state of Michigan soon after speaking with deputies.

12.      On February 23, 2022, pursuant to a search warrant, UCHENDU's Apple iPhone was searched and a connection between UCHENDU's brother and HARRIS was revealed. Specifically, UCHENDU's brother sent a Snapchat chat attachment with the phone number HARRIS is using approximately 1 week ago.

## PROBABLE CAUSE

### *Report of Armed Robbery*

13.      On February 15, 2022, at approximately 1:55 PM, Meridian Township Police (MTPD), responded to Okemos Community Church, located at 4734 Okemos Road, Okemos, Michigan, in reference to a reported armed robbery. The caller, UCHENDU, advised the dispatcher

that he was the driver of a cash-in-transit van and had just been robbed by two black males with rifles. UCHENDU advised the male suspects left in a blue Sport Utility Vehicle (SUV) and the SUV proceeded southbound on Okemos Road.

14.    Documents provided by Empyreal Logistics (EL), the owner of the cash-in-transit van, show that over $1,000,000 was taken during the robbery, including $90,000 from Capital National Bank, a Federal Deposit Insurance Corporation insured institution.

### *Interview of Uchendu (EL Van Driver)*

15.    MTPD Detectives and Special Agents with the FBI interviewed UCHENDU at 4734 Okemos Road.  UCHENDU provided the following information:

16.    On February 15, 2022, UCHENDU was working for Empyreal Logistics (EL), driving a white Ford Transit cash-in-transit van ("EL Van").  UCHENDU's duties were similar to an armored car driver. That morning UCHENDU picked up his EL Van and manifest from the EL office located at 1235 Roth Drive, Lansing, Michigan. UCHENDU received a manifest each work morning listing various businesses, to include banks, financial, institutions and marijuana dispensaries, where he was required to stop and collect currency. The manifest listed the amount of currency UCHENDU was to collect at each location.

17.    UCHENDU finished his scheduled route and stopped at Best Buy, located at 2020 W Grand River Rd, Okemos, MI 48864. UCHENDU parked the van and walked into Best Buy.  Inside Best Buy, UCHENDU purchased a memory card for his personal camera. After the purchase, UCHENDU got back in the EL Van and started driving to Lansing, Michigan where the EL office is located.  While driving, UCHENDU diverted from his usual route, due to bridge construction on Okemos Road at the Red Cedar River.  While UCHENDU was driving around the area of Okemos Road and Red Cedar River, a black male driving an older blue Buick Rendezvous

repeatedly honked his horn and flashed his lights at the EL Van. UCHENDU thought he might have gotten into an accident with the Rendezvous, so UCHENDU pulled over to the side of the road.

18.     A black male (Unsub 1) exited the Rendezvous and approached the driver's side of the EL Van. Unsub 1 told UCHENDU that UCHENDU had hit the Rendezvous. UCHENDU exited the EL Van and walked back to inspect the Rendezvous for damage. While UCHENDU inspected the Rendezvous for damage, a black male passenger (Unsub 2), left the Rendezvous and entered the passenger side of the EL Van. When UCHENDU returned to the van, Unsub 2 displayed an AR-15 type rifle and told UCHENDU to drive away. Unsub 2 directed UCHENDU to Okemos Community Church and directed UCHENDU to park in the parking lot. Unsub 1 followed the EL Van in the Rendezvous and parked behind the EL Van. Once parked, Unsub 2 directed UCHENDU to open the currency safe located in the rear of the EL Van. UCHENDU opened the safe and Unsub 1 and Unsub 2 proceeded to load the Rendezvous with the currency stored in the EL Van. Unsub 1 and Unsub 2 were both wearing masks and hooded sweatshirts with the hoods pulled up over their heads. UCHENDU previously owned a Ruger model AR-15 and Unsub 2 had an AR-15 similar to the one Uchendu owned.

19.     Several weeks ago, UCHENDU got into an automobile accident while at work. UCHENDU struck a traffic cone on the highway and the traffic cone deflected from UCHENDU's vehicle and struck the other vehicle. UCHENDU pulled over to exchange information with the other driver. UCHENDU gave the other driver UCHENDU's information, but UCHENDU never received information from the other driver. UCHENDU was counselled by his management for stopping the van after the accident. UCHENDU was told by his management to only stop in safe areas where other people were around.

20.     UCHENDU did not know of any friends or contacts that would have targeted him for the robbery. UCHENDU told two of his friends and some of his family where he worked.  UCHENDU believed he was targeted or surveilled at one of his pick-up locations prior to the robbery.

***Empyreal Logistics and its Vans***

21.     EL is headquartered in Denver, Colorado and conducts business in several other states therefore engaging in interstate commerce. An EL Van functions similar to an armored car conducting money pick-ups from businesses and banks. EL drivers are not armed during the performance of their duties.  The EL Van Uchendu was driving is a white Ford Transit van. It does not feature any markings or logos which would indicate the van's purpose or company affiliation. The EL Van was equipped with GPS monitoring, 360-degree exterior video surveillance, interior video surveillance and audio recording capability.

***Surveillance Footage from the Day of the Robbery***

22.     MTPD investigators have extensively reviewed the video recordings from the EL van, the Best Buy parking lot, and other surveillance videos from UCHENDU's reported path of travel on the day of the robbery.

23.     The EL Van's security system video footage does not capture the suspect SUV following or trailing the EL Van before UCHENDU's personal stop at Best Buy.

24.     The video surveillance footage from Capitol National Bank, UCHENDU's last scheduled stop, does not feature the suspect SUV in the area during UCHENDU's schedule pickup.

25.     Best Buy video surveillance footage depicting the Best Buy parking lot reveals the following:

26.     UCHENDU parked the EL Van in the Best Buy parking lot.  A blue Buick Rendezvous pulled into the Best Buy parking lot shortly after UCHENDU parked the EL van in the lot. UCHENDU is walking into the Best Buy at approximately the same time the Rendezvous is parking. It is unclear where exactly the white SUV parks at in the lot.

27.     A white SUV pulled into the parking lot near the time the same time as the Rendezvous.

28.     UCHENDU spent approximately 12 minutes inside Best Buy before returning to the EL Van.  UCHENDU got inside the EL Van and drove out of the parking lot.  The Rendezvous and the white SUV exited the lot and followed the EL Van.

29.     The EL Van's security system video footage depicts the Rendezvous following the EL Van after the EL Van left the Best Buy parking lot for several minutes at a low speed around the area of Okemos Road and the Red Cedar River.

30.     The EL Van's security system audio recording captured the Rendezvous briefly sounding the horn one time prior to UCHENDU pulling over and being approached by Unsub 1. The EL Van's security video footage depicts the EL Van appear to slow down prior to the Rendezvous honking.

31.     The EL Van's security system audio recording captured an exchange between Unsub 1 and UCHENDU after UCHENDU pulled the EL Van over:  Unsub 1 told UCHENDU that UCHENDU hit the Rendezvous.  UCHENDU responded that he did not hit the Rendezvous and he will get out of the van and look.

32.     The EL Van's security video footage depicted Unsub 1 at the driver's side of the EL Van.  This is a screen shot from that footage:

8



33.    The EL Van's security system video footage does not depict the EL Van in a position where it could have struck or been in any other type of collision with the Rendezvous at a point in time after the EL Van left the Best Buy parking lot but before the Rendezvous honked.

9

34.     The EL Van's security system video footage depicts Unsub 2 enter the front passenger side almost simultaneously as UCHENDU exited the El Van.  The EL Van's security system audio recording captured the passenger door shut.  This is a screen shot from the video footage depicting UCHENDU exiting the El Van and the Unsub 2 entering the El Van:



35.     The EL Van's security system video footage depicts UCHENDU return to the driver's side of the EL Van with Unsub 2 sitting in the passenger side seat.  Unsub 2 has the AR-15 style rifle positioned in Unsub 2's lap.  There is no magazine in the magazine well of the rifle.  The EL Van security system audio recording captured Unsub 2 instruct UCHENDU to get into the van and drive.  This is a screen shot from the video footage depicting Unsub 2 in the passenger seat with the AR-15 style rifle without magazine:



36.     The EL Van security system audio recording captured Unsub 2 direct UCHENDU to the Okemos Church parking lot.  Unsub 2 then directed UCHENDU to park in the middle of the open lot and open the safe in the back of the van.  The El Van security system video footage depicts the Rendezvous pull in behind the EL Van.

37.     The EL Van's security system video footage depicts a similar white SUV from the Best Buy parking lot parked in the rear of the Okemos Community Church parking lot at the time UCHENDU pulled into the lot.

38.     The EL Van security system video footage depicts Unsub 2 get out of the EL Van and watch UCHENDU at the back of the van.  Unsub 2 went to the back of the van.  Unsub 2 left the AR-15 style rifle in the van during this time.  Unsub 1 and Unsub 2 then loaded the money deposits into the Rendezvous from the EL Van.  While Unsub 1 and Unsub 2 loaded the money deposits, the white SUV left the church parking lot.  After loading the money deposits into the

Rendezvous, Unsub 2 went to the front passenger seat and retrieved the AR-15 style rifle.  Unsub 1 and Unsub 2 got inside the Rendezvous and left the church parking lot.

### EL's Policies and Procedures

39.    Law enforcement agents have spoken to multiple members of EL's management about EL's policies and procedures. Based on those interviews, I am informed that UCHENDU violated multiple policies and procedures established by EL to protect cash-in-transit.

a.    First, EL drivers are specifically warned about bump and rob tactics in which a subject attempts to stage an accident in order to distract a driver and intercept cash-in-transit vans. EL drivers are instructed to never pull over a cash-in-transit van in the manner UCHENDU did on February 15, 2022.

b.    Second, according to EL management, the drivers should not have individual access to the vault located in the rear of the van where the money deposits are held. The cash-in-transit vans contain two vaults or safes in the rear of the van.  One of the vaults is specifically used only for money deposits.  Money deposits are deposited via a one-way chute into this vault. The money deposit vault may be accessed with a vault code.  According to EL management, drivers should not have the code to the money deposit vault.  UCHENDU explained in his interview with law enforcement that he had the code to access the money deposit vault and used the code to access the vault during the robbery.

c.     Third, cash-in-transit van drivers are trained to use a duress button in situations such as an armed robbery.  According to EL management, there is a green button behind the steering wheel.  There is no record of UCHENDU activating the duress button.

12

40.     UCHENDU provided me with the phone number of 517-748-8140 (8140) during the interview on February 15, 2022. On February 17, 2022, UCHENDU was contacted via 8140 by the FBI in order to set up the polygraph examination.

41.     On February 18, 2022, UCHENDU submitted to a polygraph examination conducted by FBI Special Agent Michael Fitzgerald at the Federal Bureau of Investigation Lansing Resident agency. conducted the polygraph. SA Fitzgerald is a certified Federal Polygraph Examiner and has been for 11 years.  SA Fitzgerald has served as an FBI Special Agent for 18 years.  Prior to his service as an FBI special agent, SA Fitzgerald worked as a prosecuting attorney in Cuyahoga County, Ohio for approximately 2 ½ years.

42.     During the pre-polygraph interview, UCHENDU told SA Fitzgerald that he called and texted individuals using his Apple iPhone with phone number 8140 just prior to going to Best Buy. UCHENDU stated he communicated with his brother, his girlfriend, and an individual UCHENDU knows by the alias of Trap Baby Pack. UCHENDU stated he may have communicated with other individuals prior to going to Best Buy but he could not remember the names of the individuals. Video from the interior of the EL van show UCHENDU manipulating his phone prior to arriving at Best Buy. UCHENDU also stated he is aware of the duress button on the steering wheel.  UCHENDU is not certain what happens if he activates the duress button but he is trained that he is supposed to push it if he is being robbed.

43.     UCHENDU submitted to a polygraph examination and SA Fitzgerald questioned him on his involvement, if any, in the planning of the robbery and receipt of the proceeds from the robbery.  I am advised the results of the polygraph examination were deemed conclusive and deception was indicated. SA Fitzgerald informed UCHENDU that he failed the polygraph examination. UCHENDU stated that he was being framed for the robbery and that he would like

an attorney. Once UCHENDU asked for an attorney, agents ceased any further questioning of UCHENDU.

44.     Before the pre-polygraph interview and polygraph examination, UCHENDU's Apple iPhone was placed on the counter outside of the polygraph interview room. Agents requested permission to search UCHENDU's phone and UCHENDU refused. Agents informed UCHENDU that his phone would be seized to preserve evidence and that agents would seek a warrant to search the phone. UCHENDU provided a passcode for the phone and the placed was placed in airplane mode to prevent the destruction of evidence.

***Recovery of the Blue Buick Rendezvous***

45.     On February 21, 2022, at 9:07 AM, Kent County Deputies were dispatched to 8215 Division Avenue Southwest, Grand Rapids, Michigan, for an abandoned vehicle. Upon arrival, deputies discovered a 2003 Buick Rendezvous. The vehicle was blue and grey in color and was spray painted on the driver's side with green spray paint. The VIN tag in the front windshield was missing and the windshield glass covering the VIN was broken. The VIN tag on the driver's side door of the vehicle was also removed. Deputies noted a strong odor of bleach or cleaning chemicals coming from the Rendezvous. Deputies were able to locate a VIN number in the rear cargo hold of the vehicle. Deputies checked the VIN and found that it belonged to TODD LEMONTE HARRIS JR. (HARRIS).

46.     On February 23, 2022, I observed the blue Buick Rendezvous which was located at Berry's & Gillikin's Towing, 3200 E Beltline Avenue Northeast Grand Rapids, MI 49525. I observed the Rendezvous to be consistent with the Rendezvous used in the EL Van Robbery. Specifically, the Rendezvous used in the robbery was missing a rear passenger side hub cap. The

Rendezvous I observed at Berry's and Gillikin's Towing lot was also missing the rear passenger side hub cap and had consistent color, trim and features as the robbery Rendezvous.

***Contact with the HARRIS, the Registered Owner of the SUBJECT PROPERTY***

47.     On February 21, 2022, deputies contacted HARRIS using the telephone number 616-427-9534. HARRIS told deputies that he sold the SUBJECT PROPERTY on December 15, 2021, to an unknown male. HARRIS described the male as a light skin, black, male, 6'1", with a thin build who walked with a limp. HARRIS stated that he was approached by the male while he was walking out of the O'Reilly Auto Parts. The male offered HARRIS $1500.00 USC for the SUBJECT PROPERTY. HARRIS stated knew the transmission was about to die so he accepted the offer. HARRIS provided the male with the title to the SUBJECT PROPERTY which HARRIS kept in the glove box. HARRIS called an Uber to drive him home. HARRIS asked deputies if he could retrieve the SUBJECT PROPERTY from the impound lot since the SUBJECT PROPERTY was still in his name.  Deputies told him no because it was being processed as evidence.

48.     On February 23, 2022, FBI agents and MTPD detectives went to HARRIS' address of 4764 Wolf Run Avenue, Grand Rapids, Michigan. Agents and detectives knocked on the front door of the residence and received no answer. I contacted HARRIS via telephone number 616-427-9534. HARRIS advised that he was out of town and planned to return on February 27, 2022. HARRIS agreed to meet me on February 28, 2022, at 4764 Wolf Run Avenue, Grand Rapids, Michigan at 10:00 AM. HARRIS also confirmed that his was still living at the residence.

49.     Approximately 20 minutes after the initial phone call with HARRIS, HARRIS called me back and advised he was now going to be out of town until sometime in March because he had to attend a family funeral in Wisconsin. HARRIS advised that he was currently located in Atlanta, Georgia. I asked HARRIS when he left Michigan and he said something to the effect of

"a while ago."  I asked HARRIS to be more specific about his departure time and HARRIS stated, "two days after." I asked HARRIS if he meant two days after deputies spoke with him and HARRIS responded "yes." I confronted HARRIS with the fact that deputies spoke with him on Monday and HARRIS replied that he had actually just arrived in Atlanta and that he slept in his friend's car last night on the way to Atlanta. HARRIS said that he was getting a hotel room at the Red Roof Inn located at 637 GA-138 W, Stockbridge, GA 30281. HARRIS agreed to meet me at Red Roof Inn on February 24, 2022.

50.    On February 23, 2022, MTPD detectives went back to 4764 Wolf Run Avenue, Grand Rapids, Michigan. Detectives spoke with Lonnie Polk who identified himself as HARRIS' stepdad. Polk advised that HARRIS had not lived at the residence for over a year. Polk had no further information about HARRIS.

51.    After speaking with Polk, detectives spoke with HARRIS' mother Monica Sparks-Polk. Sparks-Polk stated that she spoke with HARRIS a few days ago and that she recalled HARRIS was trying to sell his vehicle back in December, but she did not have any further details about the sale. Sparks-Polk talked to HARRIS' father, Todd Harris Sr., on February 21, 2022. Sparks-Polk understood from that conversation that HARRIS' father that he wanted HARRIS to come to Detroit, Michigan to attend a family funeral. Sparks-Polk provided the full name of an individual she understood to be HARRIS' best friend.  Sparks-Polk also stated that she did not have a current address for HARRIS, but she knew he lived close.

***Valvoline Surveillance Footage***

52.    On February 23, 2022, MTPD received information that a Buick Rendezvous registered to HARRIS had been serviced at Valvoline, located at 4403 Eastern Southeast, Kentwood, Michigan, on February 5, 2022, and February 15, 2022 (the day of the robbery).

Detectives spoke with employees at Valvoline and reviewed video surveillance footage from both February 5, 2022, and February 15, 2022. The video from February 5, 2022, showed a black male driving a Buick Rendezvous. The black male stuck his head out the driver's side window of the vehicle while receiving service. Detectives observed the black male driving the Rendezvous bared an extremely strong resemblance to HARRIS. Below to the left is a still shot from the Valvoline video surveillance footage.  Below to the right is a screen shot of a photograph of HARRIS posted to an Instagram user account believed to be associated with HARRIS.

 

53.     The Valvoline surveillance video also showed the serviced Rendezvous bore the Michigan License Plate ENQ 9665, which is registered to HARRIS. Valvoline's records documented an address of 295 Travelo Street Southeast, Grands Rapids, Michigan associated with the Rendezvous. The Valvoline service invoice listed HARRIS as the registered owner. According to Google Maps, 295 Travelo Street is approximately 4.9 miles from 8215 Division Avenue South where the Rendezvous was discovered.

*UCHENDU's Brother's Connection to HARRIS*

54.     On February 23, 2022, MTPD Detectives reviewed publicly available information for the "certified_tjjay" the username for a publicly available Instagram account. Detectives observed multiple photos of HARRIS on the account. Detectives also noted that one comment to a post made by "certified_tjjay" stated "I see you Mr.Harris."  Detectives noted that the Instagram account "certified tjjay" is being followed by "susu.ent" a username for a publicly available Instagram account.  The profile picture for the username "susu.ent" is a photograph of Stephen Uchendu, PACHAL UCHENDU's brother.

55.     On February 23, 2022, FBI agents obtained a Kentwood Police Report regarding Stephen Uchendu and HARRIS. The report stated that on March 24, 2020, at 7:00 AM, Kentwood Police Department Officers made contact with Stephen Uchendu, HARRIS, and a third individual found asleep inside of a car in Kentwood, Michigan.

56.     On February 23, 2022, I obtained a search warrant for the Apple iPhone seized from UCHENDU on February 18, 2022.  During the search of the Apple iPhone, agents discovered a Snapchat chat attachment from Stephen Uchendu with the telephone number 616-427-9534.  This is the same telephone number I used to contact HARRIS on February 23, 2022.



## CONCLUSION

57.     I respectfully submit that there is probable cause to believe that evidence, fruits, and instrumentalities of SUBJECT OFFENSES may be found in the SUBJECT PROPERTY described in Attachment A.

58.     I therefore respectfully request that the attached warrant be issued authorizing the search and seizure of the items listed in Attachment B.